Filed 7/8/26  P. v. Perez CA4/1
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D084222 |
| Plaintiff and Respondent, | (Super. Ct. No. SCD172230) |
| v. | |
| SANTIAGO RAMIREZ PEREZ, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Yvonne Esperanza Campos, Judge.  Affirmed.

Belinda Escobosa, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Collette C. Cavalier and Ksenia Gracheva, Deputy Attorneys General, for Plaintiff and Respondent.

In 2003, Santiago Ramirez Perez, who was not a citizen but was a lawful permanent resident of the United States, pleaded guilty to molesting his three-year-old daughter.  In accordance with the plea agreement, Perez

was sentenced to three years of probation after serving local confinement of 180 days with work furlough. Because the conviction was an aggravated felony, however, Perez was deported to his home country of Mexico while on work furlough. After this initial deportation, Perez sought and was denied habeas corpus relief. While his habeas challenges were pending, Perez was granted parole to reenter the United States and, despite losing his habeas challenges, he remained in the United States until December 2014. At that time, he was arrested by immigration officials and again deported to Mexico.

In 2023, after changes to California law, Perez filed a motion to vacate his conviction under Penal Code section 1473.7, asserting he was not adequately informed of the immigration consequences of the plea agreement.[1] After an evidentiary hearing, the trial court denied the motion. On appeal, Perez again argues he was not informed that he would face deportation if he pleaded guilty to the molestation offense and asks this court to reverse. As we shall explain, we conclude that the trial court properly denied Perez's motion and affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Background & Criminal Conviction*

The record does not make clear when Perez moved to the United States, but he received lawful permanent resident status in 1995. He shares three children with his ex-wife who were born in 1991, 1996, and 1999—the middle child is the victim in the underlying criminal matter—and who are United States citizens.

On January 14, 2003, the San Diego County District Attorney filed a complaint charging Perez with a single count of committing a lewd and

---

[1] Subsequent undesignated statutory references are to the Penal Code.

2

lascivious act upon a child under 14 years old (§ 288, subd. (a); count 1). On May 21, 2003, he entered a guilty plea to the charge, admitting he "willfully and lewdly committed a lewd and lascivious act with a child under the age of 14."[2] The same day, Perez executed a written change of plea form with the assistance of a Spanish language interpreter. On the form, the interpreter certified she translated the entire form and its attachments for Perez, and that Perez "indicated understanding of the contents of [the] form and any addendum and then initialed and signed the form and any addendum."

Section 7d of the form, titled, "CONSEQUENCES OF PLEA OF GUILTY OR NO CONTENT," stated, "I understand that if I am not a U.S. citizen, this plea of Guilty/No Contest may result in my removal/deportation, exclusion from admission to the U.S. and denial of naturalization.

---

[2] The record contains limited factual information about the crime to which Perez pleaded guilty. The probation report submitted for the sentencing hearing states that one night in December 1999, after his wife kicked him out of their bedroom, Perez went to sleep in his three-year-old daughter's bed with her. Sometime later, his wife heard their daughter crying and went to her room to find Perez there without any clothing on. The next day, Perez's wife took the daughter to the hospital and reported that Perez had molested her. The daughter was examined but there was no indication of abuse, and no charges were pursued against Perez. The couple separated after this incident.

In May the following year, the wife again reported the same incident to the child abuse hotline. The child was interviewed by investigators, but she did not report the abuse. Two years later, in May 2002, the child reported the abuse at school and this time disclosed to investigators that Perez had put his hand in her underwear and his finger inside her vagina. This disclosure resulted in Perez's arrest. He was then given a polygraph examination that showed deception around his responses to questions about the alleged abuse. During a subsequent interrogation, Perez admitted he touched his daughter's vagina on top of her clothing and he masturbated while in bed with her.

3

Additionally, if this plea is to an 'Aggravated Felony' listed on the back of this form, then I **will** be deported, excluded from admission to the U.S., and denied naturalization." (Emphasis in original.) Perez initialed next to this advisement. The addendum attached to the plea form set forth a list of aggravated felonies and stated in bold, "**ANY CONVICTION OF A NON-CITIZEN FOR AN 'AGGRAVATED FELONY' AS DEFINED UNDER 8 U.S.C. 1101(a)(43), WILL RESULT IN REMOVAL/DEPORTATION, EXCLUSION, AND DENIAL OF NATURALIZATION.**" Under this statement, the document set forth a non-exclusive list of 20 felonies including: "**SEXUAL ABUSE OF A MINOR (Touching is not required, e.g.: Indecent Exposure**)."

At the change of plea hearing, the trial court questioned Perez about the change of plea form. When the court asked Perez, through a court-certified interpreter, if the form was explained to him by his attorney, Perez responded, "Yes." When the court asked if Perez "underst[oo]d that if [Perez was] not a citizen, this plea could result in [his] exclusion from the United States and potential reentry into the United States and denial of citizenship," Perez also responded, "Yes."

On June 19, 2003, the trial court sentenced Perez to three years of formal probation and 180 days in custody to be served through a work furlough program. The court also ordered him to register as a sex offender and to pay various fines and fees "if not deported."[3] Soon after he was convicted, immigration authorities detained Perez. The Immigration and Naturalization Service initiated removal proceedings and alleged that Perez

---

[3]  The court interlineated "if not deported" two times on the minute order memorializing the pronouncement of judgment.

had been convicted of violating section 288, subdivision (a). Perez challenged the removal but was unsuccessful. On February 11, 2004, relying on a certified record of conviction from the underlying criminal case, the immigration court denied termination of the removal and ordered Perez deported to Mexico.

B. *Habeas Corpus Proceedings*

Before the deportation order was issued, Perez filed a petition for writ of habeas corpus in San Diego Superior Court. Perez asked the court to vacate his guilty plea and set aside his sentence on three grounds: (1) he received ineffective assistance of counsel because he was not advised that the conviction would result in deportation, (2) his defense counsel did not properly advise him about the polygraph examination, and (3) he was prejudiced by defense counsel's failure in allowing him to be interrogated after the polygraph without counsel present. The trial court issued an order to show cause why relief should not be granted. After additional briefing, the court denied the petition in part, rejecting Perez's claim as related to the polygraph examination, but ordered an evidentiary hearing to further consider whether Perez's defense counsel had misrepresented the immigration consequences of the plea agreement and to consider whether Perez admitted wrongdoing during the interrogation that could sustain the conviction.

At the evidentiary hearing, Perez testified that his defense counsel, Jonathan Lacey, did not explain the immigration consequences of his guilty plea to him and that he would not have entered the guilty plea if he understood it would result in his deportation. Perez also testified that the plea form was not read to him in its entirety and that Lacey told him "he would have no problem with immigration."

5

Lacey also testified. He told the court he did not have a clear recollection of the plea hearing. Lacey explained he had represented Perez in his divorce and had little criminal law experience. Lacey had worked on less than five criminal cases at the time he represented Perez in the underlying matter. Lacey testified he "may have worked on some immigration matters prior to [Perez]'s case, and indicated that, after [Perez]'s plea, he consulted a law school professor about the immigration consequences." Lacey further stated that he did read and explain the entire plea form to Perez, including the paragraph concerning immigration. In its order denying the petition, the court explained that Lacey "indicated he did not personally think [Perez] would actually be deported because he believed the duration of [Perez]'s residence in the United States would exempt him from deportation. According to Mr. Lacey, he never explicitly told [Perez] that he would not be deported, but rather that deportation would be unlikely."

The court denied Perez's petition on January 28, 2005.[4] It found Perez had not met his burden to show ineffective assistance of counsel, and found that Perez's claim that he was not informed of the immigration consequences of the plea was "not corroborated by substantial credible evidence. Rather, [Perez]'s assertion that he was never told of the immigration consequences of his plea [wa]s belied by (1) his initials on the plea form, particularly with regard to paragraph 7d, (2) the transcript of the hearing on [Perez]'s plea, in which the Court questioned [Perez] specifically on his understanding of the potential immigration consequences for his plea and (3) counsel's testimony at the evidentiary hearing that he reviewed the plea document in full with [Perez]." The court concluded that, "[a]lthough the evidence provided to this

---

4     Perez was deported on May 15, 2004.

Court indicates Mr. Lacey may have expressed optimism about his client's ability to avoid immigration consequences, the evidence does not demonstrate Mr. Lacey made any affirmative misrepresentation or gave erroneous advice regarding the potential for such consequences."

After the trial court denied Perez's habeas petition, he filed a second habeas petition in this court. While the petition was pending, Perez was granted parole to reenter the United States. On August 11, 2005, this court denied Perez's petition, concluding "there [was] no indication that the plea offer was inaccurately communicated to [Perez] or that the prosecution was willing to accept a plea that would have avoided immigration consequences." This court's denial order further stated that had "Perez gone to trial he would have faced up to eight years in prison. Though the probable outcome of a trial is difficult to discern on this record, conviction is more than a remote possibility because [Perez] told police investigators that he touched his daughter's vagina outside her clothing and then masturbated. He has since recanted this statement, but he has not established it would be excluded from evidence at trial. If it is not excluded, it could support a guilty finding by a jury."

Despite the denial of Perez's habeas petitions, Perez remained in the United States. In his declaration in support of the underlying motion, Perez stated that he remained in the United States because he was unaware his habeas petitions had been denied. Then, in 2014, he was arrested by immigration officials and on December 17, 2015 Perez was again deported to Mexico.

C. *Motion to Vacate Conviction*

Almost eight years later, on November 7, 2023, Perez filed the underlying motion to vacate his conviction under section 1473.7.[5] As he argued in his habeas petitions, Perez asserted that Lacey had failed to adequately advise him that a conviction under section 288, subdivision (a) was a mandatory deportable offense that would also prevent him from reentering the United States. Perez asserted Lacey affirmatively told him that there would be no adverse immigration consequences to his plea. With his motion, Perez submitted the declaration of an immigration attorney, who opined that (1) Perez was not adequately informed of the immigration consequences of his plea agreement, and (2) alternative pleas with no immigration consequences could have been pursued by Lacey. In addition, Perez submitted immigration documentation and letters of recommendation from his long-time partner, D.V., who resides in the United States, D.V.'s two daughters, and several friends and neighbors.

The People opposed the motion, arguing Perez failed to meet the requirements of section 1473.7 because the trial court that took his plea and his defense counsel both adequately advised him of the immigration consequences, and he was not prejudiced. The People asserted Perez's claims

---

[5]     Perez filed an unopposed motion to augment the record with the section 1473.7 motion and supporting documents, which were not included in the initial record prepared by the trial court. After we granted the motion to augment and ordered the trial court to prepare a supplemental transcript, the trial court clerk filed a certificate indicating the documents were lost. We then issued a modified order deferring the motion to augment to this panel. We now grant the motion to augment and deem the copy of the motion and supporting documents submitted by Perez with the motion to augment part of the appellate record.

8

were contradicted by the record, including Lacey's declaration and testimony in the habeas proceeding, and rested only on Perez's bare assertions that Lacey gave improper advice and that he did not understand the immigration consequences of his plea.

On April 22, 2024, the superior court conducted an evidentiary hearing on Perez's motion. Perez appeared virtually with a Spanish-language interpreter and was represented by a privately retained attorney. He testified that he hired Lacey because Lacey had been Perez's family law attorney for over two years, and Perez "knew him, … trusted him, and … thought that he would represent [Perez] just fine." According to Perez, Lacey told him to sign the guilty plea form and assured him there would be no immigration consequences. Perez testified that had he known his plea could result in deportation, he would have chosen to go to trial.

On cross-examination, Perez asserted for the first time that the court asked Lacey if he had read the immigration consequences on the plea form to Perez, and Lacey responded "no." Perez said the trial court then instructed Lacey to step into the hallway and read the form to Perez. Perez said his girlfriend, D.V., was at the hearing and accompanied him and Lacey to the hallway because no interpreter was available. Perez stated Lacey read the form "really, really quick" while D.V. attempted to translate. Perez stated that Lacey "kept insisting" that there would be no immigration consequences, that "all of this will end in just a few months," and Perez "could continue living [his] life normally."

Perez also testified that he did not recall reviewing the change of plea form with an interpreter and that, although he initialed each box on the form, he did not understand it. Perez acknowledged that his conviction was listed as an aggravated felony on the back of the plea form. When the

9

prosecutor directed Perez to the transcript of his plea hearing and asked if he remembered the court specifically inquiring, "Do you understand that if you are not a citizen, this plea could result in your exclusion from the United States and potential [denial of] reentry into the United States and denial of citizenship as well," Perez said he did not remember. On redirect examination, Perez testified that Lacey expressly told him that he "would not be deported if [he] were to accept" the plea deal.

D.V. also testified. She and Perez began dating before the criminal charges were brought against him in 2003. She testified she was in the audience at the change of plea hearing and corroborated Perez's testimony that the judge asked Lacey if he had reviewed the immigration consequences of the guilty plea. D.V. stated that when Lacey responded, "no," the judge told Lacey to go out in the hallway and discuss the immigration consequences with Perez. D.V. said that Lacey told Perez "that he's going to plead guilty and he will not have any immigration consequences of his guilty plea and that was … the best outcome for him." D.V. said that Perez specifically asked if he was going to be deported and Lacey replied "no," and "there was no deportation" and "no deportation consequences." D.V. emphasized that "there was no interpreter in the hallway" and "there was no court interpreter either."

On cross-examination, D.V. testified that she could not recall if Perez was asked about immigration consequences when he pleaded guilty. However, she also testified she was in the back of the courtroom and could "hardly hear what exactly the judge was asking" Perez.

The court also examined D.V. In response to the court's questions, D.V. testified that she did not fully understand the charge against Perez at the time of his guilty plea. However, she knew that he was accused of sexual

misconduct. On re-cross examination by the People, D.V. testified that she did not think Perez would have admitted to molesting his daughter unless Lacey told him to and that Perez "did not commit the crime."

Alex Kannan, the immigration attorney who submitted a written declaration in support of Perez's motion, also testified. Kannan opined that based on Lacey's declaration, Perez did not meaningfully understand the immigration consequences of his guilty plea. In his declaration, Kannan listed several "immigration-neutral" plea alternatives that he asserted Lacey could have explored to avoid or mitigate adverse immigration consequences, including "PC 243 (Battery), PC 236 (False Imprisonment), or PC 136.1(b)(1) (Nonviolently try to persuade a witness not to file a police report), PC [459 (Disturbing the Peace), PC 591 (Damaging Phone, Electrical or Utility Line), PC 594 (Vandalism), PC 314 (Indecent Exposure), PC 647 (Disorderly Conduct), PC 647.6 (Annoying/Molesting a Child under 18)," and "PC 332 (Accessory After the Fact)."[6]

After arguments by Perez's counsel and the prosecutor, the court set forth its view of the case at length before denying the motion. The court found Perez's testimony and D.V.'s testimony were not credible, noting their accounts "flie[d] in the face of the written record," as well as "the characterization of a now-deceased counsel's advice." The court found the record made clear that Perez was advised of the potential for deportation and his self-serving statements 20 years later were insufficient to sustain his burden to prove he did not understand the immigration consequences of the

---

[6] Kannan misidentified two of these crimes, section 459 addresses burglary, not disturbing the peace, and section 332 addresses obtaining money or property by fraudulent game or trick, not accessory after the fact.

plea agreement. The court also found D.V.'s testimony was self-interested and biased, noting her relationship with Perez and her stated desire for him to return as her caregiver because of health concerns.

In addition, the court found the witnesses' assertions that a Spanish language interpreter was unavailable at the plea hearing not credible. The court noted Perez received a "very, very good deal" by pleading guilty, trading a potential eight-year prison sentence for local time served through work furlough. The court concluded that it was "not able to find that [Perez] has met the preponderance of evidence standard because I'm not able to find credible and objective the testimony and information that contradicts or flies in the fact of the official record." Perez filed a timely notice of appeal from the denial order.

DISCUSSION

I

The standards for determining a motion under section 1473.7 were recently articulated by the California Supreme Court in *People v. Espinoza* (2023) 14 Cal.5th 311, 316 (*Espinoza*): A court may "vacate a conviction if [the moving party] can establish by a preponderance of the evidence that their conviction is 'legally invalid due to prejudicial error damaging [their] ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence.' (§ 1473.7, subd. (a)(1); see *id.*, subd. (e)(1).)" (*Espinoza,* at p. 316.) Further, the "defendant must demonstrate a 'reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences' (*People v. Vivar* (2021) 11 Cal.5th 510, 529 (*Vivar*)) and must corroborate any [factual] assertions with ' " 'objective evidence' " ' (*id.* at p. 530)." (*Espinoza*, at p. 316.)

12

"Objective evidence includes facts provided by declarations, contemporaneous documentation of the defendant's immigration concerns or interactions with counsel, and evidence of the charges the defendant faced." (*Id*. at p. 321.)

"To determine whether there is a reasonable probability a defendant would have rejected a plea offer if he had understood its immigration consequences, courts must 'consider the totality of the circumstances.' (*Vivar, supra*, 11 Cal.5th at p. 529.) 'Factors particularly relevant to this inquiry include the defendant's ties to the United States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible.' (*Id*. at pp. 529–530, citing *Lee v. United States* (2017) 582 U.S. 357, 367–371 …; see *People v. Mejia* (2019) 36 Cal.App.5th 859, 872–873 ….) Also relevant are the defendant's probability of obtaining a more favorable outcome if he had rejected the plea, as well as the difference between the bargained-for term and the likely term if he were convicted at trial. (See *People v. Martinez* (2013) 57 Cal.4th 555, 564 ….) These factors are not exhaustive, and no single type of evidence is a prerequisite to relief." (*Espinoza, supra*, 14 Cal.5th at pp. 320–321.)

"We apply independent review to evaluate whether a defendant has demonstrated a reasonable probability that he would have rejected the plea offer had he understood its immigration consequences. (*Vivar, supra*, 11 Cal.5th at p. 527.) ' "[U]nder independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law." ' (*Ibid*.) When courts engage in independent review, they must give deference to the trial court's factual determinations if they are based on ' "the credibility of witnesses the [superior court] heard and observed.' "

(*Ibid*.)  But when the trial court's findings 'derive entirely from written declarations and other documents,' the trial court and the reviewing court ' "are in the same position," ' and no deference is owed." (*Espinoza, supra*, 14 Cal.5th at pp. 319–320.)

II

As he did in the trial court, Perez asserts that he did not understand he would be deported to Mexico if he pleaded guilty.  Specifically, he argues the immigration warning in the plea agreement was boilerplate and insufficient to alert him of the definite immigration consequences he faced.  In support of this assertion he points to *People v. Patterson* (2017) 2 Cal.5th 885 (*Patterson*).  In *Patterson*, the trial court denied the defendant's motion to withdraw his guilty plea under section 1018 on the ground of mistake or ignorance and his subsequent petition for habeas corpus based on his assertion that his defense counsel was ineffective because he did not understand the immigration consequences of the plea agreement.  (*Id*. at pp. 890, 892.)  After the Court of Appeal affirmed the trial court's decision on the defendant's motion and also denied a second habeas corpus petition brought by the defendant in that court, the Supreme Court granted the defendant's petition for review and reversed the denial of the section 1018 motion.  (*Id*. at p. 893.)

Before Patterson, a non-citizen, entered his guilty plea, the trial court provided the required advisement under section 1016.5 that " '[i]f you are not a citizen, you are hereby advised that conviction of the offense for which you have been charged *may* have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States' ([§ 1016.5,] subd. (a))." (*Patterson, supra*, 2 Cal.5th at pp. 894–895, italics added.)  Patterson argued that despite the advisement,

14

he was not aware that the guilty plea he entered subjected him to mandatory deportation. The Supreme Court agreed with Patterson that the boilerplate advisement required by section 1016.5 did not preclude Patterson from seeking relief under section 1018. The court explained, "[a] defendant entering a guilty plea may be aware that some criminal convictions may have immigration consequences as a general matter, and yet be unaware that a conviction for a specific charged offense will render the defendant subject to mandatory removal. Thus, as we have previously noted in a different context, the standard section 1016.5 advisement that a criminal conviction 'may' have adverse immigration consequences 'cannot be taken as placing [the defendant] on notice that, owing to his particular circumstances, he faces an actual risk of suffering such.' " (*Patterson,* at pp. 895–896.)

Here, unlike the indefinite advisement in *Patterson,* the advisement provided to Perez was not a general advisement that he might be subject to deportation. Rather, the plea form Perez initialed explicitly stated that the conviction to which he was pleading guilty, violating section 288, subdivision (a), subjected him to mandatory removal by federal immigration authorities. Contrary to his assertion, this was not a vague advisement (or complete absence of advisement) like the one at issue in *Patterson* or in other cases that Perez cites. (See, e.g., *People v. Soriano* (1987) 194 Cal.App.3d 1470, 1481–1482 [defendant's trial counsel affirmatively misled him by stating deportation was an unlikely possibility without understanding that deportation was definite; pro forma advisement under section 1016.5 insufficient in this circumstance] and *People v. Superior Court (Giron)* (1974) 11 Cal.3d 793, 798 [affirming trial court's order withdrawing guilty plea where neither party nor the court understood collateral immigration consequences of the plea].)

15

Perez next asserts that the explicit advisement in the plea form was inadequate because Lacey failed to clarify the immigration consequences faced by Perez and affirmatively misled Perez to believe that he would not be deported. Lacey is now deceased, and we have only the declaration he submitted in support of Perez's habeas petition and the trial court's recitation in its order of Lacey's testimony at the evidentiary hearing. In his declaration, Lacey stated that at the trial readiness conference, after the plea was discussed, there was a discussion about immigration. Lacey wrote he "informed [Perez] that due to this conviction it was unlikely that he would be able to become a citizen of the United States," and "further informed [Perez] that a local San Diego Court could not affect in any way what would happen in a Court of immigration jurisdiction." Lacey also wrote, "Beyond the discussion of citizenship, other immigration consequences were not explored in any depth and the actual issue of deportation may or may not have been discussed."

The trial court's order denying Perez's habeas petition states Lacey testified he did read and explain the entire plea form to Perez, including the paragraph concerning immigration. As noted, the court concluded Lacey "indicated he did not personally think [Perez] would actually be deported because he believed the duration of [Perez]'s residence in the United States would exempt him from deportation. According to Mr. Lacey, he never explicitly told [Perez] that he would not be deported, but rather that deportation would be unlikely."

Perez argues Lacey's statement that obtaining "citizenship was unlikely" was misleading and caused Perez to believe he could stay in this country so long as he did not seek citizenship. However, the court's order also states that Lacey read the entire plea form to his client, which included

16

the advisement that Perez faced certain removal. This fact supports the conclusion that Perez was aware of the immigration consequences of his plea.

In addition, the trial court in *this* proceeding did not believe Perez or D.V.'s accounts of the plea hearing and determined neither witness was credible. Although we independently review the order denying Perez's motion, we are bound by the trial court's first-hand credibility determinations and cannot reevaluate witness testimony from our removed vantage point. In light of this factual determination and the statements of Lacey in the habeas proceeding, we agree with the trial court that Perez's recent self-serving statements are not sufficient to meet his burden to show, by a preponderance of evidence, that he did not " 'meaningfully understand … the actual or potential adverse immigration consequences' " of the underlying plea. (*Espinoza, supra*, 14 Cal.5th at p. 316.)

We further agree with the trial court that Perez has not shown that there is a reasonable probability that he would have rejected the plea if he did understand the immigration consequences. First, there is little evidence concerning whether Perez could have obtained a different plea agreement that did not risk removal from the United States. Perhaps understandably given the amount of time that has passed since the plea, Perez provides no evidence as to whether the parties in this case were willing to consider alternative plea terms that would have avoided the immigration consequence of the deal they entered.[7]

---

[7] Further, neither Lacey's nor Perez's testimony shows that Perez expressed any specific concern about the immigration consequences at the time of the plea, despite the court's specific inquiry at the hearing.

17

Instead, Perez points only to the list of other crimes provided by Kannan as alternative plea options in his declaration. We agree with the Attorney General that it is not likely the prosecution would have agreed to a conviction for crimes like vandalism or damaging a phone line, which have no factual basis or relation to Perez's crime. Perez fails to explain how the court could have approved such a plea without a factual basis for such charges. (See § 1192.5, subd. (c) [before accepting a defendant's plea of guilty to a felony charge, a trial court must ascertain that there is a factual basis for the plea]; *People v. Palmer* (2013) 58 Cal.4th 110, 115 [the purpose of the factual basis requirement is to "ensure[ ] that defendant knowingly and voluntarily pleaded [guilty] only to charges corresponding in seriousness to the acts he committed"].) As the Attorney General points out, Perez has not identified an immigration-neutral offense to which he could have pleaded guilty. (See *People v. Alvernaz* (1992) 2 Cal.4th 924, 941 ["although it may well be that in our frequently overcrowded courts, judicial rejection of plea bargains is the exception rather than the general rule, we may not simply *presume* … that the trial court automatically would have approved a plea bargain negotiated by the prosecutor and the defense" (original italics)]; cf. *Vivar, supra*, 11 Cal.5th at p. 531 ["What the record also shows—and neither the Court of Appeal nor the Attorney General disputes—is that Vivar could have entered a plea avoiding mandatory deportation."].)

Further, Perez's stipulated sentence was exceedingly lenient given the seriousness of the offense. He faced eight years in prison if convicted of the charge and received only 180 days in local custody with work furlough in addition to parole. It is not farfetched to conclude that Perez might have wanted this light sentence, even with likely deportation, to avoid a long prison term. Such an outcome is particularly reasonable given the fact that

18

Perez confessed to the crime after his arrest and his daughter told investigators that Perez had touched her inappropriately. This was strong evidence that made the likelihood of a guilty verdict greater and supports the inference that Perez might have preferred deportation and the opportunity to live freely in Mexico over the chance of receiving an eight-year prison term.

Perez emphasizes that he immediately sought to reverse his guilty plea after he was taken into custody by immigration officials by filing a petition for habeas corpus, and that he had strong ties to the United States because of his children and relationship with D.V., who is a citizen. He argues these factors show he would not have entered the plea if he understood that he faced deportation. We agree with Perez that his decision to seek habeas relief right after he was deported supports an inference that he did not fully understand the immigration consequences of the plea. (See *Vivar, supra*, 11 Cal.5th at p. 531 [defendant's immediate post-conviction efforts to undo plea agreement probative of his lack of understanding and showed reasonable probability he would not have accepted plea].)

However, we are less persuaded by the facts concerning his ties to the United States. The record contains little information about those ties at the time of the plea, and does not show how long Perez was in the United States before the crime. What is in the record suggests that at the time of the plea agreement he had been in a relationship with D.V. for two or three years and he was estranged from his three children. Because Perez remained in the United States for about a decade after his deportation was paroled, the evidence does show that his ties to the United States strengthened in that time. However, we do not agree with Perez that the events that occurred after the plea was entered are probative of his understanding of the immigration consequences or whether there was a reasonable probability he

19

would have accepted the plea *at that time*, which is the relevant inquiry for purposes of section 1473.7.  (Cf. *Vivar, supra*, 11 Cal.5th at p. 530 [defendant was "brought to this country at age six as a lawful resident, and he attended schools, formed a family, and remained here for 40 years.  At the time of his plea, he had two children, two grandchildren, and a wife, all of whom are citizens and all of whom resided in California.  …  By contrast, [defendant] had virtually no ties to Mexico, spoke Spanish 'like an American,' and found it 'difficult to function in Mexican society because people treat [him] like an outsider"].)

Looking at the totality of the circumstances, as we must, we agree with the trial court that Perez failed to show by a preponderance of evidence that he did not understand the immigration consequences of his guilty plea, or that there was a reasonable probability he would have entered a plea that avoided the consequences.

DISPOSITION

The order is affirmed.


McCONNELL, P. J.

WE CONCUR:


O'ROURKE, J.


RUBIN, J.